(43 South. 993.)

No. 16,385.

TAYLOR v. JAY.

(May 13, 1907.)

BROKERS—COMMISSIONS—EVIDENCE.
    Involves only questions of fact.
(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; John St. Paul, Judge.

Action by William R. Taylor against William T. Jay to recover commission. Judgment for defendant, and plaintiff appeals.

Judgment set aside in so far as it was one of nonsuit, and judgment of definitive dismissal entered.

Léon L. Labatt, Saunders & Gurley, and Hall & Monroe, for appellant. Howe, Fenner, Spencer & Cocke, for appellee.

PROVOSTY, J. Plaintiff's suit is based upon an alleged contract under which he claims to be entitled to a commission for having procured a purchaser for defendant's property. The amount claimed is $2,500, being 5 per cent. on the amount of the sale. The property was a sawmill plant, consisting of a sawmill, with large tracts of timber lands, railroad, and equipment, houses, barges, tugs, etc., situated in the parish of St. Tammany. The date of the sale was October, 1905. Plaintiff is a real estate broker engaged in the sale of such property. The contract alleged in the petition reads as follows:

"October 13, 1904.

"W. R. Taylor, Esq., City—Dear Sir: Being advised by you that you have a purchaser for the lumber plant of Mr. W. T. Jay, at Madisonville, La., including his timber interest—in fact, all the property which he owns in the parishes of St. Tammany, Washington, and Tangipahoa—for the sum of six hundred thousand dollars, I am authorized by Mr. Jay to say that, in the event of your consummating a sale of this property, he will pay you a commission of 5 per cent. of the amount of the purchase price thereof. This authorization, though, is based upon the following understanding:

"There are other people who have approached Mr. Jay in regard to the purchase of this property, and one particularly; and, should it develop that your purchaser is the same party who has already approached Mr. Jay through other channels, of course, Mr. Jay under no circumstances is to be called upon to pay two commissions; it being understood that the party who has already brought Mr. Jay in touch with this party is to receive the commission, should he become a purchaser.

"It is not intended, under any circumstances, to convey to you or to any one else a right of option on the property of the plant of Mr. Jay, and, in making this agreement, it is done with full power and authority in Mr. Jay to withdraw his plant from the market if he chooses so to do, or to sell to any one else he may deem proper to negotiate with. However, every facility will be afforded your party to verify the correctness of the facts and figures which Mr.

Jay has represented, and, after examination, if the parties are in earnest and desire to purchase this property, and require a limited time to make financial arrangements, upon the deposit of a sufficient amount of cash to justify the conclusion that they are in earnest in a bank in the city of New Orleans, to be forfeited in the event of their failure to carry through the deal, Mr. Jay will extend to them an exclusive privilege for a period of thirty days.

"It is, or course, necessary that Mr. Jay should be advised at once of the name or names of the party or parties that you represent in the matter, in order that there may be no possible conflict as to commissions; and, in the event of the person or persons that you represent not being the one or ones who have already approached Mr. Jay, should your parties determine to make a purchase of his property, you will alone receive the commission.

"Yours very truly,
"[Signed] Sam Henderson, Jr.
"I approve the contents of this letter.
"[Signed] W. J. Jay."

On the day after this contract was signed plaintiff wrote to defendant the following letter:

"October 14, 1904.

"Mr. Sam Henderson, Jr., City—Dear Sir: I am in receipt of yours of the 13th, and in reply will say, while the matter is all right as far as it goes, I do not think it full enough to be entirely satisfactory. I am simply acting as a broker or agent in the matter, and when I bring buyer and seller together, in the event of a trade, my commission will be considered earned; in other words, I cannot consummate a trade without Mr. Jay's assistance, not only as to his own property, but the outside holdings as explained to you.

"I gave you yesterday names of our customer as F. G. Weyerhaeuser, of Weyerhaeuser & Dickman, Rock Island, Ill., and St. Paul, Minn. These parties are able to pay cash for a proposition ten times the size of Mr. Jay's; in fact, recently did so on the Pacific Coast, being the largest individual owners and holders of the timber lands in the country.

"I would thank you to get, from Mr. Jay direct, confirmation of my authority from you to offer the property at the price named, specifying what the proposition covers; that is, how many thousand acres of land, and how much timber he will guarantee same to yield. Likewise a list of the other property, including railroad, saw and planing mill plant, building and other improvements, lumber on the yard, railroad, steamboat, and other equipments, store —in fact, everything that goes in the trade, so that there can be no misunderstanding. I would also like his assurance to the effect that, in the event of a trade for the property, he will agree and undertake to purchase the other 30,000 odd acres for our parties at a price that will put the whole property within, or not

exceeding, $1,000,000, which he told me in person he would do.

"I would like a separate letter from him, stating that, in the event of a trade with the parties I have named, he will pay me, or to my order, a commission of 5 per cent. It is most desirable that he should also furnish me, at the earliest moment, plat showing his timber land holdings. If he has not the time to make it, and will furnish me legal description of his lands, I will have it made in my office.

"On receipt of the above I will push the matter vigorously. In the meantime, have wired my associate, Williamson, 'to arrange to get his parties here promptly.' Of course, I want, and expect, Mr. Jay to agree that he will not withdraw the property, and will not make any other sale to the prejudice of that which may be pending with my parties, as it will entail considerable expense for them to come here to investigate the proposition, and it would not be fair or reasonable to expect them to do so without assurances that they will be protected during such inspection, which, if satisfactory, and developes the proposition to be as represented, there is no question of a doubt about the trade being made. Finally, I understand, and expect, that Mr. Jay will treat Mr. Weyerhaeuser, or his firm, as our customer, in the event of any trade, indirectly or directly, with him or them, that he will protect our commission, as it is through our agency that his property has been, or will be, presented to him.

"Yours very truly,
"[Signed] Wm. R. Taylor."

Defendant contends that the foregoing contract was not a continuing contract, but was restricted to the party or parties with whom plaintiff claimed to be at the time already in negotiation, which parties turned out to be Weyerhaeuser & Dickman, to whom no sale was made.

Defendant further contends that, even if this contract had been a continuing contract, still no commission would be due plaintiff, because the purchaser was not procured by him.

On the trial plaintiff sought to supplement the foregoing contract by testifying that he made it a' point, whenever he saw Mr. Henderson, defendant's agent, to ask him about this property, and whether it had been disposed of, and that Henderson invariably replied:

"We have not sold the property, and whenever you bring a purchaser who will qualify

to Mr. Jay's satisfaction we will treat him and recognize him as your purchaser and in the event of a trade will pay you the commission."

Also by testifying that long after the deal with Weyerhaeuser & Dickman had fallen through, defendant furnished him with a detailed list of his property, which conduct of defendant went to show that the contract was understood to be as a continuing one. In plaintiff's brief it is said that the fact of these conversations having taken place is not contradicted by Mr. Henderson.

But we find that they are. Mr. Henderson was asked:

"Did you, in behalf of Mr. Jay, ever give to Mr. Taylor any other or further authority, or enter into any other or further contract of employment with Mr. Taylor on behalf of Mr. Jay, than is evidenced by the document shown you, marked 'P. I'?"

And he answered:

"I did not."

In regard to the time when the detailed list describing the property was given to plaintiff, Mr. Jay testifies that it was "about the time of the contract—October 13th."

On its face the contract was not a continuing contract, but was restricted to the purchaser whom plaintiff was already in negotiation with. This results from the language of the contract. Thus:

"Being advised by you that you have a purchaser." "Should it develop that your purchaser." "If the parties are in earnest." "It is necessary that Mr. Jay should be advised at once of the name or names of the party or parties you represent in this matter."

And plaintiff's letter of the next day confirms this. Thus:

"I gave you yesterday the name of our purchaser." "I would like a separate letter from him, stating that, in the event of a trade with the parties I have named, he will pay me, or to my order, a commission of five per cent." "On receipt of the above I will push the matter on vigorously. In the meantime have wired my associate, Williamson, to arrange to get his parties here promptly. Of course, I want, and expect, Mr. Jay to agree that he will not withdraw the property, and will not make any other

sale to the prejudice of that which may be pending with my parties, as it will entail considerable expense for them to come here to investigate the proposition, and it would not be fair or reasonable to expect them to do so without assurances that they will be protected during such inspection, which, if satisfactory, and develops the proposition to be as represented, there is no question of doubt about the trade being made. Finally, I understand, and expect, that Mr. Jay will treat Mr. Weyerhaeuser, or his firm, as our customer, and in the event of a trade, indirectly or directly, with him or them, that he will protect our commission, as it is through our agency that his property has been or will be presented to him."

All these expressions clearly indicate, we think, that the contract was made with exclusive reference to the purchaser whom plaintiff was already in negotiation with, or had already procured.

Nor is there anything in the subsequent conduct or correspondence of the parties going to show that they understood the contract differently. We will here give this correspondence in full, except the letters of October 15th and 17th, which manifestly have reference exclusively to Weyerhaeuser & Dickman, and the carbon copy of letter of February 10, 1905, the authenticity of which is a disputed point.

On January 5, 1905, the plaintiff wrote to Mr. Henderson as follows:

"January 5, 1905.
"Mr. Sam Henderson, Jr., City—Dear Sir: Inclosed find letter just received from Mr. Cramb, one of the two gentlemen who came here to see me regarding the Jay property.
"Please note what he says, and, after taking the matter up with Mr. Jay, advise instructions.
"These men have gone to considerable trouble and expenses in this matter. If they produce satisfactory reference, it will cost Mr. Jay nothing to meet them.
"Yours very truly,	Wm. R. Taylor."

In this letter the plaintiff inclosed the following letter to him from A. S. Cramb:

"January 4, 1905.
"Wm. R. Taylor, Esq., New Orleans, La.—Dear Sir: I am in receipt this morning of a wire from Northern parties, saying that they are satisfied with the description of the Jay properties which I had furnished them, together

with price, terms, and other conditions, with which we are familiar, and also notifying me that they will leave there on next Monday for New Orleans to make examination of the proposition.

"At this writing I am not informed as to who will come, but am in position to assure you that they will bring letters of introduction, etc., which will absolutely satisfy you and Mr. Jay of their unquestionable financial standing and responsibility.

"Upon a full consultation with Mr. Blair, we have thought it best to go personally to New Orleans to meet the party, and I now expect him, representing both my interest and his own, to leave Monday night, and see you there at your office Tuesday a. m., although the party will not arrive until probably Tuesday night.

"They will wish, among the first requirements, to see a sectional map of the whole property offered them, and I trust you will take the necessary steps to have everything in good shape as possible to show them. I have stated it strongly to them, but have not in any respect, or upon any point, exaggerated, and, naturally, am anxious that the matters shall be presented to them in as favorable a light as is consistent with the facts and actual conditions, in the interest of all concerned

"Yours very truly,                A. S. Cramb."

On January 18, 1905, the plaintiff wrote to the defendant the following letter:

"January 18, 1905.
"Mr. W. T. Jay, 610 Hibernia Bank Bldg., City—Dear Sir: I have 'phoned over to your office, and called there a couple of times, and, finding you out, write Mr. J. P. Brayton is now in the city, and has come South to make inspection of your timber and property across the lake in the interest of a large manufacturing company who are rated in Bradstreet at $500,000 to $1,000,000. I have looked them up, and they are all right. I have given him list of the property which you handed me in your office some time ago, and I have priced the same at $600,000. I am unable to furnish Mr. Brayton plan of the property, and request that you kindly send me over same, showing location of your holding by township, range, and section numbers, and if you can approximately state the outside timber which we can secure. Otherwise, if you have not plat of the property, send me list from your title by township, range, and section, and I will make plat up for him in my office. Mr. Brayton will be here until Friday or Saturday, and if you desire to know the name of the parties to whom we wish to present the matter I will obtain his consent and give you their names.

"Kindly give this matter your prompt attention, and very much oblige.

"Yours very truly,        Wm. R. Taylor."

To this letter the defendant responded as follows:

"January 18, 1905.
"Mr. W. R. Taylor, 603 Hennen Bldg., City—Dear Sir: I have yours of even date, and regret I am not in a position to talk business with Mr. Brayton.

"I have turned the business over to Mr. J. D. Lacey, for the present, whose clients are now, and for some time past have been, estimating the timber.

"Yours truly,                W. T. Jay."

On January 19, 1905, the plaintiff wrote the defendant as follows:

"January 19th, 1905.
"Mr. W. T. Jay, 610 Hibernia Bank Bldg., City—Dear Sir: I am in receipt of yours of the 18th, in reply to mine of same date, from which I note you say you turned the business over to Mr. Lacey. Knowing that I have been acting in good faith with you, and have gone to considerable trouble and expense in the matter to sell your property, I do not feel that you have shown me proper courtesy in not notifying me to this effect before. Had you furnished me proper plat of the property, I would have been glad to estimate the timber free of any expense to you, as I offered to do; and I now request, after Mr. Lacey's clients are through with the matter, if you do not do business with them, that you give me such necessary data as I should have in order to place it properly and intelligently before my clients, who will be able to buy and pay for several properties like yours.

"Yours very truly,        Wm. R. Taylor."

On February 28, 1905, the plaintiff wrote the defendant as follows:

"Mr. W. T. Jay, Hibernia Bank Bldg., City—Dear Sir: One of the parties to whom I offered your property, and whom you will recall came here to see me in regard to same about sixty days ago, is now writing me about the matter, and states in his letter 'he is informed by W. T. O'Connor that he has direct Mr. Jay lumbering proposition, and that he had a party making a preliminary inspection of the whole property with present prospect of consummating sale of it.'

"I think proper to advise you of this information, and beg to ask the present situation, and, further, whether you desire to furnish me with the information asked in my last, which is necessary to present the matter intelligently to my principals, who are well able to purchase a property many times the size of yours.

"I do not know Mr. O'Connor, or anything about him, and I have only presented your property to two different parties, in accordance with our understanding that it would not be offered around promiscuously.

"Yours very truly,        Wm. R. Taylor."

On March 6, 1905, the defendant replied to the foregoing letter as follows:

"March 6, 1905.

"Mr. Wm. R. Taylor, 603 Hennen Bldg., City—Dear Sir: Replying to your letter of February 28th, will say that I never heard of Mr. W. T. O'Connor, mentioned in your letter, and he certainly has no such authority from me as you speak of.

"Respectfully,                    W. T. Jay."

On March 13, 1905, the plaintiff wrote the defendant as follows:

"March 13, 1905.

"Mr. W. T. Jay, Hibernia Bank Bldg., City—Dear Sir: I inclose letter received from my Houston correspondent, thinking the information contained therein might interest you.

"Mr. Cramb is one of the parties who was here some time ago wanting to look over your property.

"The Mr. O'Connor referred to is a Houston real estate man, and, while I do not know him very well, had some business in Houston several years ago, and understood he was not considered very reliable. I wish you would kindly advise the situation with regard to your property, whether you wish to dispose of it on terms formerly mentioned. You will understand I do not expect or want any commission until I produce the actual buyer, and I have already given you my assurance that I would not offer the property except to responsible buyers.

"The fact of the matter is, however, you gave the property to some one within the past year who has hawked it all over the country, and every timber land man between this city and New York seems to have it presented to him.

"Yours very truly,          Wm. R. Taylor."

On March 17, 1905, the plaintiff wrote the defendant as follows:

"March 17, 1905.

"Mr. W. T. Jay, Hibernia Bank Bldg., City—Dear Sir: I am without reply to my last communication, and if you desire to dispose of your property, and will afford me a fair opportunity, I believe I can assist you towards the end. Of course, it is distinctly understood I am not wanting or looking for any commission until I shall have earned same, and I do not want to be classed with average run of land agents who have hawked your property all over the country to its injury.

"Yours very truly,          Wm. R. Taylor."

On March 20, 1905, the defendant replied to the two foregoing letters of the plaintiff as follows:

"March 20, 1905.

"Mr. Wm. R. Taylor, 603 Hennen Bldg., City—Dear Sir: I arrived in New Orleans this

morning, and have your letters. At this moment I cannot give you a positive answer, but hope to do so shortly.

"Yours truly,                    W. T. Jay."

On August 10, 1905, the plaintiff wrote the defendant as follows:

"August 10, 1905.

"Mr. W. T. Jay, Hibernia Bank Bldg., City—Dear Sir: I called at your office several times, and, finding you out, 'phoned as many times requesting that you advise me on your return to the office, so that I could come over and see you in regard to your pine lands.

"On the last occasion when we discussed this matter in Mr. Henderson's office, as I recollect, you stated you had taken options on 10,000 acres of timber. I would like to know if you have purchased same, and if you will guarantee 240,000,000 feet on your other lands contained in the original proposition which you handed me some time ago.

"If you will put me in possession to do so, I can sell this timber for about $500,000, exclusive of railroads, mill plants, boats, and other equipments.

"My parties want the timber, but would not entertain the other property; but I have other parties who would.

"I have looked my parties up, and they are responsible, and mean business. I have a letter from them again to-day in regard to the matter, and request, if you really wish to dispose of the property, that you furnish me a correct plat of your holdings, including the additional 10,000 acres, if you purchased same; otherwise, memo. of what additional timber my parties could secure in the event they purchased your tract from you, and at what price. I am limited to $2 per M, cut 8,000 ft.

"If you will give me the desired information, I will go over in person and take the matter up with my parties in Michigan, as I am satisfied I can close the deal with them, provided your property will show up to advantage, as above.

"In the meantime, as my woodsmen cannot get in and out, I would like to put them on your land for the purpose of estimating same for my clients. I understand that St. Tammany is not quarantined, and we could put in balance of month to advantage.

"You will understand I am paying my own expenses, and do not look to you for any commission until I introduce the buyer to you. I want nothing that I don't earn.

"If you really wish to do business, please act promptly in the matter, as otherwise I have several other propositions which I can take up and present them to my clients.

"Yours respectfully,          Wm. R. Taylor.

"This was sent to my office, and, being informed of your departure, mail it. We take up to 500,000,000 ft. (a) No. 2, 8,000 ft. and over without improvements.                    T."

On August 12, 1905, the defendant replied to the foregoing as follows:

"August 12, 1905.

"Mr. Wm. R. Taylor, 603 Hennen Bldg., New Orleans, La.—Dear Sir: I have your favor 10th inst. Replying, would say that, while I have the greatest confidence in your sincerity and believe in the matter of which you write, I think so little of the prospective purchasers that I would not care to waste any time in the matter.

"Regarding the price mentioned, would remark, as you well know, timber has gone up far beyond two dollars per thousand.

"In fact, when properly located, I would myself pay three dollars per thousand.

"Yours truly, W. T. Jay."

On August 14, 1905, the plaintiff wrote to the defendant as follows:

"August 14, 1905.

"Mr. W. T. Jay, Madisonville, La.—Dear Sir: I am in receipt of yours of the 12th, and, while I do not wish to annoy you, or appear unnecessarily persistent in the matter, I would like to get such information as is necessary to present your property to a responsible buyer.

"Not knowing who my prospective purchasers are, you are not in a position to form any opinion of them. I have looked them up, personally through commercial agencies and other sources, and can assure you they are reliable.

"Please advise me definitely and finally if your property is for sale at the price and terms mentioned in Mr. Henderson's office; that is, $600,000, less 5 per cent. Further, if you will go North and take the matter up in person. This costs you nothing, and I am not hawking your property about. I dislike to drop a proposition once I take hold of it, and have put several deals bigger than this in the last two years.

"I note what you say about the price of timber. I will make contract with you to deliver 20,000 acres carrying 20,000,000 feet in Alabama at $1.50 per M. I will do better than this. I have options on the timber at $1, and will sell them out at 25 cents profit per M. feet cash. The timber has been estimated by two of my cruisers—T. J. Adams, Alabama, and Wm. Wilson, New Orleans—both of whom are reliable estimators.

"If your property is not in the market, and you do not desire to sell it, kindly let me hear from you to this effect, so that I can drop the matter, and oblige.

"Yours very truly, Wm. R. Taylor.

"P. S. I send you map of our Alabama pine lands. That in white I control by written contract (practically deeds), one of which I send you inclosed, which please return, after perusal, for my files. The balance, 'X' marked, we can cure, and now control to a certain extent on same basis.

"The Talapoosa River Lbr. Co. is a private partnership, composed of myself and Capt. Adams. We will sell outright all our contracts for $25,000 spot cash, and agree to turn over a buyer for the timber at $2 per M. payable as cut; he agreeing to build and operate a 50,000 ft. mill.

"W. R. T."

On August 17, 1905, the defendant replied to the foregoing letter as follows:

"August 17, 1905.

"Mr. W. R. Taylor, 603 Hennen Bldg., City—Dear Sir: Replying to your favor of the 14th inst., will say I do not wish to take up the matter at present regarding the land which you send me sketch. I would be glad to make a deal with you if it were in my territory, but being located in Alabama, I cannot use it.

"Respectfully, W. T. Jay."

We do not find that the language of the plaintiff in these letters is that of a person who understands that he has a contract by which he is entitled to a commission in case he procures a purchaser. In the letter of January 5th, for instance, he does not say, "I have found a purchaser in accordance with our contract, and I now give you his name." But he says, "It will cost Mr. Jay nothing to meet them." If there had been a contract, Mr. Jay would have had to meet the parties presented, whether it cost him anything or not. Again, in the letter of Jan. 18th, plaintiff does not say, "I now give you the name of my purchaser," as he would have done if he had understood that he had a contract; but he says, "If you desire to know the name of the parties," etc., as if the matter were not one of obligation, but simply of option or choice on the part of Jay. And, finally, Jay's answer is conclusive that he, at any rate, did not understand that he considered himself under contract: "I am not in a position to talk business," etc. And plaintiff's answer to this is not, "You have violated your contract with me," as it would have been if he had understood that he had a contract; but, "I do not feel that you have shown me proper courtesy." Plaintiff, being in the brokerage business,

must be assumed to have known that Jay, while at liberty to put an end at any time to such a contract as that alleged in the petition, yet could not do so after a purchaser had been presented.

But, if the contract of October 13, 1904, had been a continuing contract, it would certainly have been put an end to by defendant's letter of January 18, 1905, where defendant says that he is "not in a position to talk business" with plaintiff's proposed purchaser, and that he "has turned the business over to Mr. J. D. Lacy for the present."

Plaintiff's learned counsel say that by this letter of the 18th the contract with him was merely suspended pending the negotiations with Lacey, and that it revived automatically as soon as the transaction with Lacey was ended. But, even if it be granted, for argument, that this letter indicates nothing more than a mere suspension of the contract, the fact would remain that the suspension thus indicated was indefinite as to duration, and hence was bound to continue until defendant had given his consent to the contrary, and it is not pretended that such contrary consent was ever given. By his letters of March 13 and 18, 1905, plaintiff solicited a renewal of authority to represent defendant in procuring a purchaser; but defendant, by his letter of March 20, 1905, refused to grant same. By the letter of August 10, 1905, plaintiff again sought employment from defendant, but was again refused. In the letter of August 14th, plaintiff inquired whether the property was still for sale, which is absolutely inconsistent with the theory of an existing contract by which a commission would have to be paid to him in case he found a purchaser for it. And in reply to said letter defendant again declined to "take the matter up at present."

We conclude that there did not exist any contract between plaintiff and defendant. But, even if one had existed, we do not think that plaintiff would have been entitled to a commission, as we do not find that the purchaser to whom the sale was made, Houlton Bros., was found or procured by him.

The record shows as follows: On the 9th of February, 1905, Mr. Houlton, of Houlton Bros., having called at plaintiff's office in search of timber for piling, in which business alone his firm was at that time engaged, plaintiff mentioned to him defendant's property, and he answered that he was not in the market for such property. Plaintiff testifies that he on the next day wrote to defendant the following letter:

"February 10, 1905.—

"Mr. W. T. Jay, 610 Hibernia Bldg., City—Dear Sir: I had a call yesterday evening from Mr. Wm. Houlton, of Houlton Bros. and the Lake Superior Piling Company, of Chicago and Duluth, Minn., who has come South to make investments in pine timber for piling and other purposes.

"After talking the matter over with Mr. Houlton, I recommended him to locate in St. Tammany parish, and offered him your property at $600,000, in accordance with our understanding.

"Mr. Houlton was recommended to me, I understand, by Mr. Brayton, my Chicago correspondent, and, while I do not know anything about him personally, you can ascertain as to his firm's responsibility through the commercial agencies, or, if desired, I will do so.

"Mr. Houlton will be here for a few days, and promised to go over and investigate the timber, so that you can be on the lookout for him.

"Yours very truly,      W. R. Taylor."

Whether this letter was ever written or not is one of the disputed points in the case. Plaintiff testifies that it was, and is corroborated by his stenographer, who says that she remembers that the letter was dictated to her. Defendant denies that he ever received the letter. Certainly, if the letter was ever written, there was no foundation for the statement contained in it that Mr. Houlton had promised to go over to investigate the timber, and that Mr. Jay might be on the lookout for him.

Houlton remained until August, 1905, in

the parish of St. Tammany, attending to his business of purchasing piling timber, and having no communication whatever with plaintiff. On the 17th of August he called to see defendant; but defendant was out, and he did not see him. He called again on the 20th, and saw defendant. He says that his interview with plaintiff in February had nothing whatever to do, directly or indirectly, with his calling upon defendant; that in February plaintiff had not mentioned to him defendant's name, but had merely mentioned the fact of having a mill plant for sale. Houlton describes his interview with defendant as follows:

"I told him I understood he had offered his property for sale. He said: 'I did a year ago, but just now I don't know that I care to sell.' But, he says, 'In case I do, I will let you know.'"

Between that date, the 20th of August, and the 26th of August, a Mr. Fisher, a correspondent and representative of plaintiff in Covington, having heard that Mr. Houlton was desirous of purchasing the Jay property, looked him up in Covington, and told him he could get the property for him; that a friend of his in New Orleans had authority to sell it. Thereupon, Houlton having expressed a willingness to deal with Taylor, Fisher at once communicated with Taylor by telephone, and Taylor drew up and sent over for Houlton's signature the following document:

"August 26th, 1905.
"Mr. William R. Taylor, New Orleans, La.—Dear Sir: We hereby agree to purchase the property of W. T. Jay, as per list attached, for the price and sum of $600,000 cash, or terms to be agreed upon.
"We agree to deposit five per cent., or $30,-000, in any bank in the city of New Orleans of Mr. Jay's selection, as earnest money to bind the trade, subject to inspection and confirmation of attached list and examination and approval of title by our attorney.
"We are ready to proceed with the inspection of the property, and request that you use your authority and arrange appointment when we can do so.
"Yours truly, [Signed] Houlton Bros."

At the same time Taylor sent over to Fisher, to be handed to Houlton, the following letter of introduction:

"August 26, 1905.
"Mr. W. T. Jay, Madisonville, La.—Dear Sir: This will introduce to you Messrs. Houlton Bros., to whom I have offered your property, as per schedule furnished me some time ago in your office, and authorized by you, for the price and sum of $600,000.
"I have their acceptance of the offer, and they advise me of their readiness of making deposit in any local bank in New Orleans of your selection of five per cent., or $30,000, earnest money to bind the trade, subject to inspection of the property and confirmation of your representation regarding same.
"Please facilitate these gentlemen in every way, and any courtesies extended will be appreciated by
"Yours very truly."

Houlton signed the foregoing letter, and took the letter of introduction, and without loss of time presented same to defendant.

"Q. What did Mr. Jay say when you presented that letter of introduction? A. His exact words were, 'That man has his nerve.' I said, 'Why'? 'Why,' he says, 'He hasn't my property for sale,' and that was all about it."

At this interview, as at that of the 20th, defendant told Houlton that he had not made up his mind to sell, but that, if he did, he would let him know. About 10 days afterwards he advised Houlton that he would sell, and the sale was thereafter consummated.

Plaintiff's learned counsel say that the purchasers to whom he had reference in his letter of August 10th were Houlton Bros., and that defendant also had reference to Houlton Bros. in his letter of August 12th, wherein he says:

"I think so little of the prospective purchasers that I would not care to waste any time in the matter."

But this cannot be, since there had not been any communication whatever between Houlton Bros. and plaintiff since February 9, 1905, and at that time Houlton Bros. had said they were not in the market for that

kind of property. The first communication plaintiff had with Houlton Bros. after February 9, 1905, was on August 26, 1906, through Fisher, over the telephone, 16 days after the said letter of the 10th of August had been written.

Plaintiff's learned counsel also argue that it was only after the letter of introduction had been presented that defendant made inquiry from the commercial agencies as to the financial standing of Houlton Bros. But defendant swears to the contrary, and he is not contradicted.

Jay testifies that Houlton had been buying property in St. Tammany, and been over that territory, and must have known of his (Jay's) property, and of the price of it, because it was "the largest proposition in that neck of the woods," and Houlton was bound to have known of it; that "around Covington everybody knows everybody's business."

Under the foregoing circumstances, it is clear that not only plaintiff was not the procuring cause of the sale, but that his intervention in the matter did not even contribute to its being made.

The judgment of the lower court was only of nonsuit. It should have been of definitive dismissal.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside, in so far as dismissing plaintiff's suit only as in case of nonsuit, and that plaintiff's demand be rejected and dismissed as in case of definitive judgment, with costs in both courts.